## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| CHRISTOPHER KRONENBERGER, M18440, | |
| Petitioner, | Case No. 1:18-cv-07061 |
| v. | Hon. Charles R. Norgle |
| TERI KENNEDY, Warden, Pontiac Correctional Center, | |
| Respondent. | |

### ORDER

Petitioner Christopher Kronenberger's petition for habeas corpus [23] is denied. Petitioner's other outstanding motions [1] [51] [59] are denied as moot. The Clerk is ordered to close the case.

### MEMORANDOM OPINION

Petitioner Christopher Kronenberger was convicted of first-degree murder by a jury in the circuit court of Cook County and sentenced by the court to 60 years in prison. People v. Kronenberger, 7 N.E.3d 769, 772 (Ill. App. Ct., 2014). The testimony and evidence at his trial was as follows.

A resident of Chicago who lived near Marquette Park testified that on October 12, 2005, she smelled smoke and burning rubber. Id. at 775. Upon investigation, she saw a car on fire in the park and a young male leaving the scene. Id. David Pina, a then 15-year-old acquaintance of Petitioner, testified that he received a call earlier that day from Petitioner who asked him to burn a car in exchange for $100. Id. He testified that he, Petitioner, and a third individual named Emil Kozeluh, drove to Marquette Park and parked in front of a green Cadillac. Pina testified that he saw a gun in Emil's waistband as he and Petitioner exited the vehicle to approach the green

Cadillac. Id. He also testified that there was a red gasoline can in the back of the vehicle. Id. Pina testified that he saw Petitioner get into the green Cadillac for a few minutes before returning to their vehicle for a moment to access the glove box. Id. Petitioner then began to return to the green Cadillac. Id. While Petitioner was on his way back to the vehicle, Pina testified that he heard a gunshot and saw Emil with a gun near the green Cadillac. Id. at 776. Pina ran from the scene and heard an explosion from that area. Id. Pina denied having anything to do with pouring gasoline on the victim or setting the car ablaze. Id.

The jury was provided stipulated records that showed multiple calls between Petitioner's cell phone and the victim, and calls between Pina and the Petitioner. Id. Edward Kozeluh, Emil's father, testified that he had made earlier statements to the police, but could not recall their details because he was under the influence of heroin at the time. The State confronted Edward with statements he made during the grand jury proceedings, wherein "Edward had testified that he was previously present for a conversation between Emil and the [Petitioner], in which the [Petitioner] said he 'popped' [the victim] in the head, he 'blew off' [the victim]'s head, and he was shocked to see [the victim] still alive to wipe blood and gasoline off his own face." Id. Officer Whelehan testified that Edward relayed that information about Petitioner's conversation to him when Officer Whelehan arrested him for drug possession in February 2006. Id.

Detective Bush and Officer Biggane arrested Petitioner and transported him to a police station in December 2006. Id. at 777. On the way to the police station, Detective Bush testified that, after being read his Miranda rights, "the defendant asked whether the murder for which he was under arrest was the murder in Marquette Park. When [the officers] responded in the affirmative, the defendant continued to talk and stated that he and Emil had planned to rob the victim, but that the defendant did not know Emil was going to shoot him." Id. at 774, 778. The

officers then testified about a video-recorded interview they had with Petitioner in which the Petitioner admitted the same facts, that he was part of the planned robbery but did not know Emil was going to shoot the victim. The State rested and the defense called (1) a forensic scientist who testified that there was unaccounted-for DNA at the scene of the crime and (2) a police officer who testified that Pina told the police that Petitioner had offered him $200 to burn the car rather than the $100 Pina had testified to earlier in the trial. The jury deliberated and received a redacted version of the recorded interview between the police officers and Petitioner. Id. at 777. The jury found the Petitioner guilty of first-degree murder via felony murder. Id.; dkt. 25-26 at 186-87.

The focus of the habeas petition before the Court is whether the interrogation videotape of Petitioner should have been excluded from evidence at Petitioner's trial. The videotape contains admissions by the Petitioner that he and Emil had planned to rob the victim, but that Petitioner did not know Emil was going to shoot the victim. Before trial, Petitioner, through counsel, moved to suppress the videotape on the grounds that the police officers allegedly did not scrupulously honor Petitioner's right to remain silent or his request for an attorney. That motion was denied by the trial judge. After trial on direct appeal, Petitioner's counsel argued that the police infringed on Petitioner's right to remain silent but did not challenge the trial judge's decision on the right-to-counsel issue. The appellate court affirmed, and the Illinois Supreme Court denied certiorari. Petitioner filed a post-conviction petition in state court pro se arguing that his previous counsel was ineffective for failing to raise the right-to-counsel issue on direct appeal. That argument was rejected by the trial court and affirmed by the Illinois appellate court. Importantly, Petitioner did not appeal the Illinois appellate court's decision to the Illinois Supreme Court.

Petitioner filed for habeas corpus in this Court under 28 U.S.C. §2254 challenging the state court's rulings on the motion to suppress the video-taped interrogation footage and the

3

effectiveness of his appellate counsel on his direct appeal from his conviction. First, as a threshold matter, Petitioner's challenges to the effectiveness of his appellate counsel are procedurally defaulted, as he raised them in his state court post-conviction proceedings but did not appeal them to the state supreme court. Smith v. Gaetz, 565 F.3d 346, 352 (7th Cir. 2009); McGhee v. Watson, 900 F.3d 849, 854 (7th Cir. 2018); Richardson v. Lemke, 745 F.3d 258, 268 (7th Cir. 2014). Petitioner's challenge to the propriety of the state court's denial of the motion to suppress the interrogation footage on the basis of Petitioner's right to remain silent has been through one complete round of state court review. It has thus been preserved and is properly before this Court, to which the Court now turns.

In order to succeed on a habeas petition challenging a state conviction under 28 U.S.C. § 2254, a petitioner must show that the state court decision "involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254. Petitioner challenges whether the police respected his constitutional right to remain silent and thus must show that the state court unreasonably applied clearly established federal law as determined by the Supreme Court in denying his motion to suppress. Id.

In addressing Petitioner's appeal of the trial court's decision not to suppress the video-taped interrogation footage, the Illinois appellate court found that Petitioner's statements and gestures during the interrogation "did not rise to the level of an unambiguous and unequivocal invocation of the right to silence." People v. Kronenberger, 7 N.E.3d 769, 780 (Ill. App. 1 Dist., 2014). This Court has reviewed the entirety of the approximately five hours of videotape

4

interrogation footage provided by the State.[1] Based on it, the Court concludes that the state court did not unreasonably apply federal law with respect to Petitioner's constitutional right to remain silent.

At the outset of the interrogation, the police recited to Petitioner his <u>Miranda</u> rights. Dkt. 25-28, Tape 1, at 00:30. The police confirmed that Petitioner was willing to talk to them. <u>Id.</u> at 1:40. Throughout the lengthy questioning, the police officers and detectives aggressively requested that Petitioner tell his version of events because, they claimed, Emil's father was implicating Petitioner for the murder.

### A. The state court's determination that Petitioner did not unambiguously invoke his right to remain silent at 1:00am on the night of Petitioner's arrest was not unreasonable.

As the Illinois appellate court observed, at one point during the interrogation on the night of his arrest, Petitioner was permitted to make a call to his uncle, and the following exchange occurred around 1:00am:

> Detective Murray asked whether [Petitioner] wanted to keep talking. When the defendant did not verbalize a response, Detective Murray urged him to respond "yes or no." Detective Murray then asked, "You don't want to talk to me anymore?" and "We done talking?" to which the defendant said nothing. Detective Murray then engaged in the following dialogue:
>
> "Q. [Detective Murray]: Come on, you told Uncle Mick then he asked you if you wanted a lawyer, right?
>
> A. [Defendant]: No.
>
> Q. No? Okay. If you don't want to talk anymore I'm not going to force you to talk to me. Remember this I'm going to be in periodically throughout the night while I'm putting—while he's calling the State's Attorney, alright.

---

[1] The State provided Dkt. 25-28 in the form of a physical DVD disc to the Court, containing five video files approximately one hour long each, which the Court refers to as Tapes No. 1-5. The footage itself is not available on Dkt. 25-28.

A. (Indicating)
Q. And periodically through the night if you want to talk to me again
I have no problem with that.

A. What's your name?

Q. My name is Murray. I just want you to know, okay. I really look
forward to talking to you because I really thought you were going to
do the right thing here.

A. I don't know what you guys [sic] intentions are that's all.
Q. Listen man, I have not lied to you once. He has not lied to you
once. Our intentions are to put people away who committed murder,
okay? Did you play a role?

A. Then why am I here?

Q. Why are you here? Because you played a role in it. Well then
proof [sic ] us wrong and tell us what happened. You sat in the front
seat. I'll give you a little time to think. I'll—we'll be back to see you
in a little bit."

Kronenberger, 7 N.E.3d at 780; Dkt. 25-28, Tape 1, at 31:40. The Illinois appellate court

characterized and analyzed the non-verbal gestures at the beginning of this exchange as follows:

> The defendant contends that he had invoked his right to remain silent
> by shaking and nodding his head when Detective Murray asked, as
> highlighted above, whether he wanted to keep talking, whether "you
> don't want to talk to me anymore" and whether "we done talking."
> Based on our careful and repeated review of this portion of the
> videotaped interrogation, we saw that the defendant made some very
> slight movements of his head but even after repeated viewing, it is
> unclear whether he actually nodded or shook his head in response to
> these questions. We cannot conclude that the defendant's head
> movements clearly indicated a desire to end all questioning. It
> certainly did not rise to the level of an unambiguous and unequivocal
> invocation of the right to silence.

Kronenberger, 7 N.E.3d at 780. The Court disagrees with the Illinois appellate court concerning

the visibility of Petitioner's head movements. Petitioner visibly shakes his head side to side when

Detective Murray asks, "You don't want to talk to me anymore?" Dkt. 25-28, Tape 1, at 31:50-54.

Then, Petitioner visibly shakes his head up and down when Detective Murray asks, "We done

6

talking?" Dkt. 25-28, Tape 1, at 31:54-56. However, the Court agrees with the Illinois appellate court that even if Petitioner made those gestures, they do not evince an unambiguous and unequivocal invocation of the right to silence given the context.

The officers came in and out of the room numerous times during the night, pressing Petitioner to "tell his side of the story" and to tell them the truth. Petitioner is hesitant and unsure if he can trust the officers. For example, in the exchange above, after Petitioner shakes his head to the question, "we done talking?", Detective Murry asks about his uncle that then states, "Okay. If you don't want to talk anymore I'm not going to force you to talk to me. Remember this I'm going to be in periodically throughout the night while I'm putting—while he's calling the State's Attorney, alright." Kronenberger, 7 N.E.3d at 780; Dkt. 25-28, Tape 1, at 31:40. He then states, "periodically through the night if you want to talk to me again I have no problem with that." Id. In response, Petitioner asks for his name, evincing his interest in potentially talking to him again, and shortly thereafter states "I don't know what you guys [sic] intentions are that's all." Id.

This exchange and other similar exchanges throughout the night suggest significant ambivalence on Petitioner's part as to whether he would tell the officers his version of what happened on the night of the shooting. Thus, it was not unreasonable for the state court to conclude that Petitioner's head-nodding did not reflect a desire to end all questioning, but rather an indication that he was not yet ready to talk—at least not until Petitioner believed he could trust the officers. The latter interpretation is also buttressed by Petitioner's request for the officer's name and Petitioner's continued conversation with him immediately after his purported invocation of the right to remain silent—acts inconsistent with a desire to end all questioning.

The Seventh Circuit's decision in United States v. Stewart is instructive here. 902 F.3d 664, 678 (7th Cir. 2018). In Stewart, while the defendant was being arrested for the possession of

7

illicit substances found in his vehicle, the arresting officer and the defendant had the following exchange:

> "That's a lot of drugs, bud. You want to talk to a detective?" [The defendant] appeared to shake his head to indicate 'no.' [The officer] clarified, "You do not want to talk to a detective? Well, you understand I gotta have one come out." Stewart replied, "Can you put me in the car? It's kind of cold out." Ball said, "Yes, they're going to talk to you regardless so you'll get in the car at that point. I have a dog in my car."

Id. at 678.

The lower court found that the officer was asking for clarification and that the officer "indicated to other officers that he was not sure if Stewart would talk, that he appeared not to want to talk out in the open but that he might be willing to speak with officers if they sat him in a car." Id. The Seventh Circuit found no error in that conclusion. It was thus not an unreasonable conclusion that the defendant was not expressing a desire to end all questioning, but rather an indication that he was not yet ready or willing to talk given the current circumstances. For Stewart, his shaking of the head could reasonably be construed to express a desire to only talk once others in the neighborhood could not see him talk to the police. For Petitioner, his shaking of the head could reasonably be construed to express a desire to only talk to the police once he was assured of their intentions.

Further, the Seventh Circuit held that "when a person 'appears' to nod in the negative and then refuses to clarify the meaning of that gesture, there is no clear error in concluding that the nod was not an unambiguous invocation of the right to remain silent." United States v. Stewart, 902 F.3d 664, 678 (7th Cir. 2018). When Petitioner was shaking his head in response to Detective Murray's questions, the other officer requested, if not demanded, that Petitioner respond with a verbal "yes" or "no," which Petitioner refused to provide. Dkt. 25-28, Tape 1, at 31:45-52. That

alone, based on the Seventh Circuit's guidance, strips Petitioner of any ground to challenge the state court's ruling that he failed to unambiguously invoke the right to remain silent.

**B. The state court's determination that Petitioner did not unambiguously invoke his right to remain silent at 2:00am on the night of his arrest was not unreasonable.**

Throughout the night, detectives made repeated attempts to persuade Petitioner to provide more information about his involvement in the crime, and presumably to get on tape what Petitioner had already told officers in the police car—that he was involved in the planned robbery but did not shoot the victim. The state court accurately recounts the exchange that occurred at approximately 2:00am that evening:

> At about 2:07 a.m., Detective Brogan reentered the interview room to ask if the defendant needed to use the bathroom, to which the defendant responded by shaking his head. The following dialogue then ensued:
>
> "Q. [Detective Brogan]: No? Are you done talking to me? Are you done talking to all of us?
>
> A. Yeah.
>
> Q. Yeah. Why are you being a pussy dude, seriously? These [expletive] are all tricking you out, putting you in the trick bag, putting it all on you. This is your [expletive] chance to flip the script and now you're just sitting here, [expletive] crying. Why don't you man up, dude? You want to take that weight for these [expletive]?
>
> A. (Indicating)
>
> Q. That's the path you're headed down."

Kronenberger, 7 N.E.3d at 780–81; Dkt. 25-28, Tape 2, at 41:20. Petitioner argued before the state court that by expressly responding "yeah" to Detective Brogan's question asking, "Are you done talking to all of us?", Petitioner unequivocally invoked his right to remain silent. Based on the context of the conversation, the state court held that "[i]t is unclear from the defendant's response whether he wished to invoke his constitutional right to silence or whether he, after having spoken

to Detective Brogan in the earlier 14–minute conversation, had nothing else to tell the detectives." The state court reasoned that Petitioner had already told the detectives parts of the story earlier and could have been merely indicating that he had nothing further to add. Reluctance to tell the police details of the offense or an indication that the defendant has nothing further to add are not unambiguous invocations of the right to remain silent. Mann v. Thalacker, 246 F.3d 1092, 1100 (8th Cir. 2001) ("Being evasive and reluctant to talk is different from invoking one's right to remain silent."); United States v. Ferrer-Montoya, 483 F.3d 565, 569 (8th Cir. 2007) (declining to answer questions alone is not an invocation of the right to remain silent); Bird v. Brigano, 295 F. App'x 36, 38 (6th Cir. 2008) (In context, defendant's statement that "[e]verything's right there in the paper . . . . I'm done talking about it" was not an unambiguous invocation of the right to remain silent).

Although this exchange may be a close call with respect to Petitioner's invocation of his right to remain silent, the Court may only grant relief to Petitioner if the Court finds that the state court's ruling was an unreasonable application of clearly established federal law. 28 U.S.C. § 2254. By itself, a defendant telling an officer that "we are done talking" could be construed as an unambiguous invocation of his right to remain silent. But the context here is that there was significant back-and-forth between the officers and Petitioner throughout the night, Petitioner expressed ambivalence to talking to the officers until he was in a position to trust them, and Petitioner's subsequent interactions with officers were inconsistent with a desire to cease all questioning. With that context, the Court cannot conclude that the state court unreasonably determined that Petitioner had not unambiguously invoked his right to remain silent.

**C. Even if the admission of the interrogation videotape into evidence was unlawful, it was harmless error.**

Ultimately, even if the state court was wrong and the interrogation videotape should not have been admitted into evidence at Petitioner's trial, it is highly unlikely that the outcome would have been different had the videotape been excluded. For habeas petitions under Section 2254, "the state prisoner bears the burden of demonstrating that the error had a substantial and injurious effect or influence in determining the jury's verdict." Ruiz v. United States, 990 F.3d 1025, 1031 (7th Cir. 2021) (cleaned up). Petitioner cannot show that here. Petitioner admitted in the interrogation videotape to the same material facts that he had already admitted to the officers in the police vehicle on the way to the station—that Petitioner was involved in a conspiracy to rob the victim but did not expect Emil to shoot and kill the victim. People v. Kronenberger, 7 N.E.3d 769, 774-78 (Ill. App. 1 Dist., 2014). The other testimony and evidence "overwhelmingly established" Petitioner's guilt. Id. Thus, even if the state court incorrectly admitted the interrogation videotape into evidence, Petitioner's habeas petition must still be denied.

**D. The state court reasonably concluded that Petitioner voluntarily waived his Miranda rights.**

Petitioner argues that the detectives threatened and coerced him into waiving his Miranda rights and making a confession. Dkt. 23 at 5. The officers read Petitioner his Miranda rights several times during the night in question. Kronenberger, 7 N.E.3d ¶¶10, 30. The state court determined that the officers did not threaten or coerce Petitioner but remarked on Petitioner's silence as part of their "explanation to the defendant that the only version of the events that the police possessed came from Emil's father, Edward, who had placed all of the blame for the crime on the defendant." Id. ¶43. Detectives repeatedly, and vigorously, pressed Petitioner to tell his side of the "story." Id. The state court concluded that the "remarks by the police did not 'nullify'

11

[Petitioner]'s Miranda warnings but, rather, were a zealous attempt to convince [Petitioner] to tell the truth." Id. The Court agrees. In context, the statements by the police officers were not an attempt to thwart Petitioner's Miranda rights but a consistent and repeated admonishment for Petitioner to tell the truth, in part because the only version of events relayed to the officers was from Emil's father. Tellingly, the officers repeatedly told Petitioner that he had a right to an attorney if he wanted one and ceased questioning once the Petitioner did request an attorney. Id. ¶7. Thus, the undisputed record does not support the conclusion that the officers threatened or coerced the Petitioner to waive his Miranda rights. As a result, Petitioner fails to show that the state court unreasonably applied federal law with respect to Petitioner's waiver of his Miranda rights.

Accordingly, because Petitioner has failed to show that he has any valid ground to seek relief under 28 U.S.C. § 2254, Petitioner's petition for habeas corpus filed thereunder is denied in its entirety. The Court declines to certify the petition for appeal. Slack v. McDaniel, 529 U.S. 473, 484 (2000). The Clerk is ordered to close the case. Civil case terminated.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, Judge
United States District Court

DATE: September 1, 2021